1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ANTHONY BARBARIN,

11          Petitioner,                    No. 2:04-cv-00894-MDS

12

13    vs.                                  ORDER

14

15    A.K. SCRIBNER, Warden,

16          Respondent.

17    _____/

18

19          Pending before the court is Petitioner Anthony Barbarin's (Barbarin)

20    application for a writ of habeas corpus.  For the reasons noted below, Barbarin's

21    application is DENIED.

22                                    I

23          On September 24, 1999, a Solano County Superior Court jury convicted

24    Barbarin of first-degree murder.  Barbarin was sentenced to state prison for 25

25    years to life, as well as a consecutive 6-year term for violating probation in three

26    other cases.

27

28                                    1

1    In his Second Amended Petition, Barbarin states six claims for relief: (1) his

2   due process rights were violated because one of the jurors was biased against him;

3   (2) his Confrontation Clause rights were violated because Nicole Garrott's

4   preliminary hearing testimony was admitted at trial; (3) his right to effective

5   assistance of trial counsel was violated because his attorney failed properly to

6   object to Garrott's testimony; (4) his due process rights were violated because the

7   trial court declined to instruct the jury that defendant could only be found guilty as

8   an accessory after the fact; (5) his equal protection rights were violated under

9   *Batson v. Kentucky*, 476 U.S. 79 (1986), because the prosecutor exercised

10  peremptory challenges against three African-American prospective jurors; and (6)

11  his due process rights were violated when the trial court instructed the jurors to

12  inform the court if any other juror refused to deliberate or expressed an intention

13  to disregard the law.  Second Amended Petition.

14                                              A

15   Barbarin filed a direct appeal of his conviction in the California Court of

16  Appeal, First District.  In its decision affirming the judgment and sentence, the

17  Court of Appeal summarized the relevant facts and testimony from Barbarin's

18  joint trial with his co-defendant Runako Magee:

19
20       Jamie Terrell died of gunshot wounds received while he was
         sitting in his parked car on the street outside the home of his
21       girlfriend in Vallejo. [] Runako Magee shot the victim through the
         open window of the car as Magee and [Barbarin] stood beside the
22       car talking with him. . . .

23       The murder was witnessed by victim Terrell's girlfriend, Desiree
         Williams, and her friend Leslie Martin, both of whom were
24       eighteen years old at the time. On December 21, 1998, the day of
         the murder, Martin went over to Williams's house in the late
25       morning.  In the afternoon Martin and Williams went to a store to
         purchase some food and candy.  Upon arrival, they saw [Barbarin
26       and Magee] entering the store.  Both Martin and Williams had
         first been introduced to [Barbarin and Magee] by victim Terrell
27       within the preceding month.  Martin went into the store and

28                                              2

approached [] Magee, with whom she had shared a double date roughly ten days earlier with Williams and victim Terrell. Martin told Magee she would be "hanging out" with Williams and Terrell later at Williams's house, and invited him to join them there. They exchanged pager telephone numbers.

After Martin and Williams returned to the latter's house, Martin paged [] Magee. When he responded by telephoning Williams's house, Martin told him they were getting ready to leave and were just waiting for Terrell to arrive. Magee told her he would come over. He arrived approximately 20 minutes later in an automobile with [] Barbarin driving. After waiting awhile longer for Terrell to arrive, the four decided to go to a nearby liquor store. The two young women got into the back seat of the car. As they did so, Williams noticed a six- to seven-inch chrome-colored handgun between the front passenger seat where Magee was sitting and the center armrest. Williams made eye contact with Magee, who said: "I always stay strapped." Williams understood that he meant he always had a gun with him. Martin, who got into the car after Williams, did not notice the gun or hear any conversation about it.

Magee and Barbarin purchased some alcohol at the liquor store. On the way back to Williams's house, Martin, Williams and Barbarin smoked a "blunt," a cigar made with marijuana. Williams asked Barbarin if she could use his cellular telephone to page Terrell. Barbarin replied: "You can't page that nigger to my phone," or words to that effect. However, Magee told Barbarin to let Williams use the phone, which she did. Williams left a message telling Terrell to come to her house.[1] When they arrived back at Williams's house, Barbarin parked across the street. The four waited briefly for Terrell to arrive before going in the house. After at least a quarter of an hour, Williams received a message from Terrell that he was on his way, and she informed the others. About 30 minutes later, they heard loud music coming from the street. Williams looked outside, saw that it was Terrell in his Mustang automobile, and told the others it was he.

[Barbarin and Magee] immediately went outside while Williams and Martin made their preparations to leave. Four or five minutes later, Martin walked outside, down the stairs, and down the driveway toward the street. Williams followed shortly thereafter, having paused to set the burglar alarm and lock the front door. Terrell's car was parked in the middle of the street. Magee was standing near the car directly in front of the driver's side window, while Barbarin stood to his immediate right, with their backs to the approaching women. When Martin was approximately six or

---

[1] There was conflicting testimony on whether this incident with Barbarin's cellular phone occurred before or after the group went to the liquor store.

seven feet behind Magee, she could clearly see Terrell sitting in the driver's seat of his car. She heard him, in "a soft voice," say: "What you talking about? Man, I don't know what you're talking about." As he said this, Terrell raised both his hands, which Martin could see were empty. Williams also heard Terrell say these words as she was walking down the driveway behind Martin, and she also saw Terrell raise his empty hands. Neither Martin nor Williams saw any guns or weapons. It was silent for a while, and then Martin clearly heard Barbarin say: "Man, dump on that nigger." Martin saw Magee raise a gun in his hand and fire two shots at Terrell without moving from his position at the side of the car. Terrell moaned, grabbed his left side and moved to the right, toward the passenger side of his car. Martin turned around, grabbed Williams, and ran back to the house. She heard at least two additional shots as she ran. Williams heard the shots and saw sparks, but was not certain who did the actual shooting. However, it appeared to her to have been the person closest to Terrell, i.e. Magee. Williams did not hear Barbarin say anything before the shots were fired.

When Williams and Martin reached the front door of the house, they were "frantic," "scared," and "stunned." They stooped down as Williams tried to open the door. As they did so, they heard a car take off and speed up the street, "[b]urning rubber." It took Williams about a minute to get the door open because she was shaking so much. Once inside, Williams ran to the telephone and called 911. When she got through to the 911 operator, Williams reported what had happened, but claimed she did not know who did it. Williams lied because she "was scared," "didn't know what to say, what not to say," "didn't want to get involved," and "didn't know what to do." Meanwhile, Martin could hear Terrell twice call out "help." Williams asked Martin to help Terrell while she spoke with the 911 operator.

Martin walked over to Terrell's car and spoke his name. Terrell twice said "[w]e have to go." Then he said "I can't see," started shaking, and "just stopped moving." Martin called Terrell's name loudly and touched his shoulder or arm. Williams came outside soon thereafter. She observed Terrell's eyes were closed and he was moving "back and forth." Williams was "confused and upset." She testified that she reached into Terrell's car and turned the ignition off.

Sharon Nunes lived across the street from the Williams family. Shortly after 9 p.m. on December 21, 1998, she heard loud voices and "somebody hollering." This was followed by a single gunshot, a two- or three-second pause, and then three to five more gunshots. As she ran down her hallway to see what was going on, she heard a car speed away. Nunes estimated that she was outside within 15 seconds of first hearing the last gunshots. She saw Williams and Martin standing at the end of Williams's driveway, "jumping up and down [and] screaming." When Nunes asked

4

"[w]hat happened," Martin ran inside of Williams's house as the latter replied: "They shot my boyfriend." Neither Williams nor Martin was carrying any gun or other weapon. Nunes ran back inside to get her cordless telephone, and within "a few seconds" brought it outside to call 911. By this time, Williams had run back into her house. Almost immediately she heard approaching police sirens. Nunes stayed outside until the police arrived. Nunes did not see anyone get into or take anything out of the car. Williams and Martin did not reemerge from Williams's house until they were escorted away by the police.

When the police arrived at the scene, a group of people was in the street. However, no one approached the immediate vicinity of the victim's car, which was parked in the middle of the street in front of Williams's house with its headlights on and its motor running. The doors of the car were closed and the driver's side window was rolled down. Victim Terrell was in the driver's seat. He had no pulse, and there was a large amount of blood on his front and left side. The first officer at the scene reached through the car window and turned off the car's ignition. The parking brake of Terrell's car was engaged. Medical personnel arrived, removed Terrell from his car, and attempted to revive and treat him. These efforts failed, and Terrell was subsequently pronounced dead as a result of two gunshot wounds to the left arm and the left side of his chest.

No guns or other weapons were found in the victim's car, on his person, or anywhere else at the scene. Neither were any weapons or live ammunition found by the police in their consensual search of Williams's bedroom. Both Williams and Martin were questioned by the police at the scene and then taken to the police station for further interrogation. At first, both Williams and Martin prevaricated, claiming they did not know who was responsible for the shooting.[2] Eventually, however, Williams told police that [] Magee had shot Terrell, and that [] Barbarin was standing next to him at the time. She then identified Magee in a photographic lineup. When the police told Martin that Williams was telling them the truth about what had happened, Martin also identified Magee from a photographic lineup as the person who

---

[2] During her initial questioning by police on December 21, 1998, Martin was hysterical and distraught. She told police that victim Terrell had gotten out of his automobile and come to the front door of Williams house, and that she had walked around to the far side of his car when he refused to let her in through the driver's side door. She then heard an argument, in which someone other than Terrell said "Dump on him." Then someone fired four times into the car. At trial, she testified that she did not recollect making these statements, but may have said this at first because she did not want to get involved.

had shot Terrell. Both Martin and Williams subsequently also identified [] Barbarin in another photographic lineup. They testified that they had not wanted to identify [Barbarin and Magee] at first because they did not want to get involved, and were afraid they might be harmed themselves if they did so.[3]

Very late on the night of the murder, [] Magee went to the Vallejo home of his girlfriend, Nicole Garrott. In preliminary hearing testimony, Garrott testified that when she returned to her home that night with her friend Shawnte Austin, she found Magee standing in her carport next to a car. The car matched the description of the one driven away from the murder. There was also another person there, but Garrott did not know who it was. According to Garrott's preliminary hearing testimony, Magee told her he had "caught up with somebody," but did not tell her the person's name. Garrott denied that Magee told her he had shot Terrell or anyone else that evening. Austin similarly heard Magee tell Garrott: "Baby, I finally caught up with him," but did not hear the name of the person Magee had "caught up with."[4]

Over defense objection, the prosecution was permitted to read Garrott's preliminary hearing testimony into evidence at trial because she was unavailable as a witness. Thereafter, the trial court permitted the prosecution to impeach Garrott's preliminary hearing testimony with the testimony of Vallejo Police Department Detective James Mathews, who interviewed Garrott following Magee's arrest. At that time, Garrott told Mathews that when she saw Magee on the night of the murder, he told her that he "had . . . finally caught up with Jamie Terrell and shot him." After telling her that he was leaving town and would be in contact with her later, Magee got into the passenger side of the car he had come in, and left. Garrott also told the police that Magee believed Terrell was responsible for burglarizing the West Sacramento home of [] Barbarin's sister. In her own preliminary hearing testimony, Garrott claimed the police had put words in her mouth and threatened to arrest her for aiding and abetting, and she was so scared she told them "whatever they wanted to hear."

---

[3] At one point, Williams and Martin were secretly videotaped alone together in an interview room at the police station. During their conversation, Williams said something to the effect that she wished Terrell had had a gun in his possession at the time of the shooting in order to protect himself.

[4] At trial, Austin testified that she did not hear Garrott tell her mother that Magee was wanted for murder or that Magee had killed Terrell, and she had not told this to the police. The prosecution introduced impeaching police testimony that Austin had reported that Garrott told her and her mother that Magee said he killed Terrell and had to leave the area.

[] Magee and Barbarin were arrested on December 23, 1998, in West Sacramento.  When the police told Magee he was being taken back to Vallejo to talk about the shooting, he chuckled, closed his eyes, and leaned his head back.  At the time of his arrest, Barbarin gave the police a false name.  During interrogations, Barbarin initially told police that he was not in Vallejo on the night of Terrell's murder, but instead was spending the night in Sacramento with a girl whose last name he did not know.  Later Barbarin changed his story, admitted he was in Vallejo on the evening of the murder, and told police he had gone to his mother's house after dropping Magee off at the home of Magee's girlfriend. Barbarin was aware that his sister's house had been burglarized, and told police that one of the amplifiers stolen had belonged to Magee.  However, Barbarin said he did not think Terrell was responsible for the burglary.[5]

Two bullets were removed from Terrell's body during his autopsy; one had traveled through his left arm and into the left side of the back of his chest, indicating his left arm was next to his body at his side when the shot was fired.  The other bullet, which entered Terrell's chest from the left side and slightly toward the front of his body, was found in Terrell's right thigh. There were three bullet holes in Terrell's car, each caused by incoming bullets: two on the driver's side, and one on the rear passenger's side.  The two bullets on the driver's side were each fired less than a foot from the car; the bullet entering on the passenger side was fired an estimated two to three feet from the car. No exit holes were found. Five nine-millimeter casings were found in the vicinity of Terrell's car, all fired from the same gun: one immersed in blood on the driver's seat; a second on the ground near the car; two more on the street on the driver's side; and one under the car on the driver's side.  The bullets found in Terrell's body and in the car itself were nine-millimeter caliber and were consistent with having been fired from the same gun.

There was gunshot residue on the victim's hands.  This was consistent either with him firing a gun, having been near a gun when it was fired, or having handled an object that had gunshot residue on it.  A gunshot residue expert testified that he would expect to find gunshot residue on the hands of someone shot from a "close proximity" through an open car window while sitting in the driver's seat.  On the other hand, it was very unlikely that

---

[5] Barbarin's mother initially told police she had not seen her son on the evening of the murder, and had last seen him the day before that took place.  At trial, however, she testified that Barbarin was at her house in Vallejo watching television with his girlfriend when she returned home at approximately 10:30 p.m. the evening of the murder, and she denied having told the police Barbarin was not home that night.

there would be gunshot residue on the hands of a victim shot from a distance of eight feet or more.

Both [Barbarin and Magee] testified in their own defense. Magee was 21 at the time of trial. He acknowledged carrying a gun on his person since suffering an assault in January 1998. He also admitted to one juvenile arrest on drug charges, as well as to a juvenile arrest for a robbery in the course of which he had used a gun. Magee and Terrell had been friends since they played Little League Baseball together when Magee was eight years old. Magee testified he did not suspect Terrell of any role in a recent burglary of the home of Barbarin's sister in West Sacramento, and he felt no anger or animosity towards Terrell at all. He claimed he did not have any stereo equipment at the home of Barbarin's sister when it was burglarized, and nothing belonging to him had been taken in that burglary.

Magee knew Williams and Terrell were dating, but claimed he did not know Terrell was coming over to Williams's house until he actually arrived. According to Magee, everything seemed "cool" until Terrell saw Barbarin go back in the house, at which point Terrell "started tripping" and asked Magee what Barbarin was doing at Williams's house. Terrell angrily said to Magee, "What you talking about? What you wanna do?" Magee understood Terrell's words and tone as a challenge. When Barbarin asked what was going on, Magee told him that Terrell was "tripping off this broad." Barbarin replied: "Fuck that nigga'," and started to walk away toward his own car. According to Magee, Terrell grabbed a gun on the front passenger seat. Fearing Terrell was going to shoot him, Magee reached for his own gun and shot Terrell. Magee ran behind Terrell's vehicle toward Barbarin's car in order to get away. As he did so, Terrell's car rolled backward. Thinking Terrell was backing his car up in order to shoot him, Magee fired his gun in Terrell's direction several times. He did not know how many times he fired his gun, and did not know if Terrell ever fired his gun at him. As he jumped into Barbarin's car, the latter said: "[m]an, what you do that for?" Magee said: "Get me out of here," and Barbarin sped away. According to Magee, he did not know if Terrell had been shot when he fled the scene. Barbarin wanted to "get away from there" because he was afraid the police would come and find out he had outstanding warrants for probation violation[s].

[] Barbarin's testimony differed from Magee's in several significant details. Barbarin testified that Magee was his best friend. Barbarin also knew Terrell as a friend and associate. Barbarin admitted to three felony convictions: for sale or transportation of cocaine; for possession of a firearm by a felon; and for possession of cocaine for sale. Barbarin knew his sister's house in West Sacramento had been burglarized a week or so before. He did not think Terrell had anything to do with the burglary, but he did tell the police he thought one of the

amplifiers that had been stolen had belonged to Magee.  Unlike [] Magee, who claimed he never knew Terrell was coming to Williams's house until Terrell actually arrived, Barbarin testified that Magee had told him Terrell would be coming over to Williams's house 20 to 30 minutes before Terrell arrived. According to Barbarin, Magee had asked him to stay until Magee found out from Terrell whether the latter had a problem with going on a double date, in case it did not work out and Magee needed a ride home from Barbarin.

When Terrell arrived, both [Barbarin and Magee] went outside to greet him.  Barbarin then went back inside Williams's house to get his cellular telephone while Magee talked with Terrell.  When Barbarin came back outside, Magee told him that Terrell was angry and jealous that they had been inside Williams's house. Terrell said angrily: "So what you talking about?"  Barbarin understood from Terrell's words, tone and manner that he was challenging Magee, or "calling [him] out."  Barbarin said to Magee, "Fuck that nigga'," meaning "Just leave him alone," or "let's just get out of here and leave."  Barbarin's intention was to stop his two friends from getting into a fight over something that did not really matter.  Unlike Magee, he never saw a gun inside Terrell's car, or in Terrell's hands.  Barbarin started toward his car.  As he did so, he heard a shot fired behind him.  He turned and saw Magee running around the back of Terrell's car.  Unlike Magee, Barbarin testified that he did not see Terrell's car move. He heard several more shots.  Barbarin got into the driver's seat of his own car and shut the door.  When Magee got into the passenger's seat, Barbarin asked him what he did that for.  Then he sped away, not knowing whether Terrell had been shot, but afraid of the police because there were outstanding warrants for his arrest for probation violations.

According to both [Barbarin and Magee], they first drove to Barbarin's house.  Magee testified that on the way, he threw his gun out the car window.  Barbarin denied seeing Magee with any gun, and denied seeing him throw it out the window.  Barbarin spent the night at his own house, but let Magee drive his car to Sacramento because the police would be looking for it.  On the way, Magee stopped at Garrott's house to get clothes and money. According to Magee, he did not say anything to Garrott about what had happened, and could not recall telling her "I finally caught up with him."  Magee did not stay to talk with the police because he "had a warrant."  The next day, Barbarin drove Magee's car to West Sacramento, where he sold his own car to a third party.

[] Barbarin's sister Tracy Strickland testified that both [Barbarin and Magee] occasionally stayed at her house in West Sacramento, which had been burglarized in December 1998.  She denied that anything belonging to either [Barbarin or Magee] had been stolen, and specifically denied that Magee had any stereo amplifiers at

her house.   Strickland told Magee that she believed another individual was responsible for the burglary.   As far as she knew, no one had told Magee that Terrell was the perpetrator. Strickland claimed she saw Magee in West Sacramento between 8:00 p.m. and 9:00 p.m. on the evening of the murder. Subsequently, however, she changed this testimony and stated she was not certain she had seen Magee on the night of the murder.

The defense offered evidence of victim Terrell's reputation for violence and aggressive behavior. [] Magee testified to his opinion that Terrell was violent; he had seen Terrell carrying a gun on numerous occasions.   Terrell had a bad reputation for violence in the community.  In addition, he had witnessed several incidents in which Terrell had committed acts of violence, including hitting on the head with a gun someone who owed him money; breaking the windshield of the car of someone who had blocked him in; and hitting with a stick a woman who owed him money.   According to Magee, Terrell had told him he had committed a bank robbery, had shot someone in Clearlake once, and had shot another person for slashing his tires.  [] Barbarin testified that he had twice seen Terrell with a gun.

A Clearlake police officer who had previously worked in Vallejo testified that he had stopped Terrell and another person in a vehicle in 1994, and had found a firearm in the vehicle.  In his opinion and by reputation in the law enforcement community, Terrell was a violent person.  A second Clearlake police officer also testified to his opinion that Terrell was violent, and to Terrell's similar reputation in the Clearlake law enforcement community.  However, in his approximately ten interactions with Terrell this officer had never found Terrell carrying a weapon.  In addition, the defense offered the testimony of a Clearlake resident about an incident in 1996 in which the witness's roommate had gotten into a violent fight with Terrell, in the course of which Terrell had threatened "to kill" the roommate with a gun he was carrying.  This individual acknowledged that at the time of the incident he did not tell the police that Terrell had threatened to kill his roommate, and that he "believe [d]" he had told the police that his roommate had been beating Terrell with a baseball bat.

Ex. G at 1–12.

## B

On February 25, 2002, the California Court of Appeal affirmed Barbarin's judgment of conviction.  Ex. G.  Barbarin then sought review in the California Supreme Court.  Ex. H. at 2.  The California Supreme Court denied Barbarin's petition for review on May 22, 2002.  Ex. H at 1.

10

C

On March 26, 2002, Barbarin filed a petition for a writ of habeas corpus in the California Court of Appeal.  The court of appeal denied the petition two days later.  Doc. 30-2 at 2.  In the California Supreme Court, Barbarin filed a petition for review of the Court of Appeal's denial.  On May 22, 2002, the California Supreme Court granted the petition for review, and directed the Court of Appeal to order the state to show cause in the Solano County Superior Court why the writ should not issue on account of the juror bias claim.  *In re Barbarin*, No. S105833, 2002 Cal. LEXIS 3584 (Cal. May, 22, 2002); Ex I.

On March 19, 2003, an evidentiary hearing was held in Solano County Superior Court regarding Barbarin's allegations of juror bias.  The superior court denied the petition for writ of habeas corpus.  Ex. I, RT at 72–78.  On May 3, 2004, Barbarin filed a writ for petition of habeas corpus in the California Supreme Court.  Ex. J at 2.  The California Supreme Court denied the petition on March 30, 2005.  Ex. J at 1.

D

On May 5, 2004, Barbarin filed an application for a writ of habeas corpus in this court pursuant to 28 U.S.C. § 2254.  Doc. 1.  Proceedings were stayed while Barbarin's habeas petitions were proceeding in state court.  Doc. 2.  He filed an amended petition on June 1, 2004, and a second amended petition on June 13, 2005.  Doc. 7; Doc. 18.  Scribner answered the second amended petition on December 12, 2005.  Doc. 30.  This court denied Barbarin's request to stay proceedings to allow him to exhaust additional claims.  Doc. 36.  Barbarin filed a traverse to the answer, and this court then denied, without prejudice, his request to file an amended traverse.  Doc. 39; Doc. 45.  Barbarin then filed supplemental points and authorities in support of his petition.  Doc. 46.

1    Scribner acknowledges that Barbarin has exhausted his state court remedies

2  and that his petition is timely.  Answer at 2.

3                                          II

4    This petition was filed after the enactment of the Antiterrorism and

5  Effective Death Penalty Act of 1996 (AEDPA).  Under AEDPA, a federal court

6  has limited power to grant habeas corpus relief.  AEDPA provides that

7        An application for a writ of habeas corpus on behalf of a person
         in custody pursuant to the judgment of a State court shall not be
8        granted with respect to any claim that was adjudicated on the
         merits in State court proceedings unless the adjudication of the
9        claim—

10       (1) resulted in a decision that was contrary to, or involved an
         unreasonable application of, clearly established Federal law, as
11       determined by the Supreme Court of the United States; or

12       (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
13       State court proceeding.

14  28 U.S.C. § 2254(d).  A state court decision is "contrary to" established federal

15  law if it "applies a rule that contradicts the governing law set forth in [Supreme

16  Court] cases" or "confronts a set of facts that are materially indistinguishable from

17  a decision of the Court and nevertheless arrives at a result different from [the

18  Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  A state

19  court decision is an "'unreasonable application'" if "the state court identifies the

20  correct governing legal principle from [the Supreme] Court's decisions but

21  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

22  Under these standards, "a state prisoner must show that the state court's ruling on

23  the claim being presented in federal court was so lacking in justification that there

24  was an error well understood and comprehended in existing law beyond any

25  possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770,

26  786–87 (2011).

27

28                                         12

1    To determine whether the state court's decision was contrary to or an

2  unreasonable application of established federal law, this court looks to the last

3  reasoned state court decision. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).

4  If a claim is denied in an order that is "unaccompanied by an explanation, the

5  habeas petitioner's burden still must be met by showing there was no reasonable

6  basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

7    Because Barbarin is *pro se*, this court must construe his petition liberally.

8  *Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006) ("We must 'construe *pro se*

9  habeas filings liberally.'").

10                                         III

11                                          A

12    Barbarin contends that his due process rights were violated because one of

13  the jurors was biased against him.  He raised this claim on direct appeal, in his

14  initial state habeas petition, and in his state habeas petition to the California

15  Supreme Court.  Ex. J, Br. at 6.  The California Supreme Court denied this claim

16  on the merits, Ex. J at 1, and the Solano County Superior Court issued the last

17  reasoned decision denying this claim, Ex. I, RT at 72–78.

18    Barbarin's claim rests on the allegation that juror A.R. prejudged his case.

19  Second Amended Petition at 6.  His allegation is supported by two pieces of

20  evidence in the record.  At the Superior Court evidentiary hearing, alternate juror

21  V.M. testified that A.R. commented early in the trial, "They must be guilty.  I

22  mean, just look at them."  Ex. I, RT at 7.  Another alternate juror, M.D., testified at

23  the hearing that A.R. said, "It won't take very long to decide this case," and said

24  on a separate occasion, "It won't take any time at all."  Ex. I, RT at 22, 39.

25    "The Sixth and Fourteenth Amendments 'guarantee to the criminally

26  accused a fair trial by a panel of impartial, "indifferent" jurors.'"  *Hayes v. Ayers*,

27

28                                         13

632 F.3d 500, 507 (9th Cir. 2011) (alteration omitted) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).  Because the jury's "verdict must be based upon the evidence developed at the trial[,] . . . 'a juror who has formed an opinion cannot be impartial.'"  *Irvin*, 366 U.S. at 722 (quoting *Reynolds v. United States*, 98 U.S. 145, 155 (1878)).  A state court's finding regarding juror bias is a factual question entitled to a presumption of correctness on habeas review.  *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (pre-AEDPA); *Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008) (AEDPA).  The burden of showing juror bias rests on the petitioner.  *Irvin*, 366 U.S. at 723 ("'The affirmative of the issue is upon the challenger.  Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside.'" (quoting *Reynolds*, 98 U.S. at 157)); *cf. Remmer v. United States*, 347 U.S. 227, 229 (1954) (where alleged juror bias arises from communications between jury and third parties, rather than juror prejudgment, burden rests on government to show harmlessness of error).

Following the evidentiary hearing on the juror bias claim, the Superior Court concluded that Barbarin failed to show, by a preponderance of the evidence, that juror A.R. ever stated that "[t]hey must be guilty," or words to that effect, to alternate juror V.M. or anybody else.  Ex. I, RT at 73.  The court found juror A.R. to be credible when "denying any such remark."  Ex. I, RT at 75; *see also* Ex. I, RT at 56.  The trial court further found that V.M., who was the only witness who claimed to have overheard such a statement, was not credible on account of her own biases, as "[s]he unquestionably disagreed with the verdict."  Ex. I, RT at 74.

The Superior Court also concluded that while A.R. said that "[i]t won't take very long to decide this case," she never said that "[i]t won't take any time at all."  Ex. I, RT at 76–77.  The court explained that if it were true that A.R. made both of

these statements, the court would have concluded that A.R. had prejudged the case; but if A.R. made only one of the two statements, that isolated statement would be too ambiguous to sustain Barbarin's burden of proving A.R.'s bias.  Ex. I, RT at 76–77.  The court then found alternate juror M.D.'s testimony to be unworthy of credence with respect to A.R.'s latter statement that "[i]t won't take any time at all" to decide the case. Ex. I, RT at 76–77. The court explained that M.D. did not include that statement in her written declaration (which had been submitted to the court by Barbarin's attorney).  Ex. I, RT at 76; *see also* Ex. I, RT at 39–40.  The court found it "highly unlikely that an investigator and attorneys . . . would have left this out of the statement, either intentionally or otherwise," and, furthermore, M.D. "herself testified that she read [the declaration] over" before signing it.  Ex. I, RT at 76.  The court accordingly concluded that M.D. never said that "[i]t won't take any time at all" for the jury to decide the case. *See* Ex. I, RT at 76–77.

    With respect to M.D.'s statement that "[i]t won't take very long to decide this case," the court concluded that such a "statement standing by itself" was not "evidence of a prejudgment on the case." Ex. I, RT at 77.  The court explained that the statement "certainly doesn't indicate . . . a predisposition to vote one way or the other," or that A.R. "ha[d] reached any conclusions on this case."  Ex. I, RT at 77.  The court noted that A.R. made the comment in response to M.D.'s observation that M.D.'s neighbor "had been on a trial which lasted several weeks." Ex. I, RT at 77; *see also* Ex. I, RT at 26.  The court explained that, taken in context, A.R.'s comment was merely "an innocuous statement" that "show[ed] a hope" that the case would not last for a lengthy amount of time.  Ex. I, RT at 77.  The court noted that, at the outset of trial, the presiding judge himself had informed the jurors that it would not be a long trial.  Ex. I, RT at 30, 49, 53.

15

1    In light of the trial court's factual finding that A.R. was not actually biased

2  or had prejudged Barbarin's case, the state courts' decisions were neither contrary

3  to, nor unreasonable applications of, clearly established law regarding jury bias.

4  28 U.S.C. § 2254(d)(1).  In addition, the state courts' decisions did not make "an

5  unreasonable determination of the facts in light of the evidence presented" to the

6  Superior Court, *id.* § 2254(d)(2), and Barbarin has not met his burden of showing

7  by clear and convincing evidence that the state courts' factual conclusions are

8  incorrect, *id.* § 2254(e)(1).  Habeas relief is not warranted on this ground.

9                                                      B

10   Barbarin next contends that his Confrontation Clause rights were violated

11  because Nicole Garrott's preliminary hearing testimony was admitted at trial.

12  Traverse at 5–6; *see also* Second Amended Petition at 6.  The California Court of

13  Appeal denied this claim on direct appeal.  Ex. G at 20–27.

14   As Barbarin acknowledges in his supplemental points and authorities, Doc.

15  46 at 3–4, his Confrontation Clause claim is governed by the standard articulated

16  in *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), not the more recent standard of

17  *Crawford v. Washington*, 541 U.S. 36, 59 (2004), which does not apply

18  retroactively to post-conviction proceedings such as this petition, *Whorton v.*

19  *Bockting*, 549 U.S. 406, 421 (2007).

20   In *Ohio v. Roberts*, the Court held:

21    when a hearsay declarant is not present for cross-examination at
      trial, the Confrontation Clause normally requires a showing that
22    he is unavailable.  Even then, his statement is admissible only if
      it bears adequate "indicia of reliability."  Reliability can be
23    inferred without more in a case where the evidence falls within
      a firmly rooted hearsay exception.  In other cases, the evidence
24    must be excluded, at least absent a showing of particularized
      guarantees of trustworthiness.
25
26  448 U.S. at 66.  The relevant questions, then, are (1) whether Garrott was indeed

27  "unavailable," and (2) whether Garrott's preliminary hearing testimony "bears

28                                                     16

adequate 'indicia of reliability'" to permit its admission under the Confrontation Clause.

Barbarin appears to concede the second question, as he does not contend that Garrott's preliminary hearing testimony lacks adequate indicia of reliability or falls outside a firmly rooted hearsay exception. *See generally* Second Amended Petition; Traverse; Supplemental Authorities (Doc. 46). Indeed, the Supreme Court has repeatedly stated that sworn preliminary hearing testimony is permissible where it was made before a judicial tribunal, the defendant was represented by counsel, and there was an opportunity for cross-examination. *Roberts*, 448 U.S. at 70–73; *California v. Green*, 399 U.S. 149, 165–68 (1970). Because Garrott's preliminary hearing testimony satisfied these criteria, it therefore "bears adequate 'indicia of reliability,'" *Roberts*, 448 U.S. at 66, and Barbarin does not argue to the contrary.[6]

With respect to the other necessary element of *Roberts*'s two-part test (Garrott's unavailability at trial), Supreme Court case law requires that "prosecutorial authorities have made a good-faith effort to obtain [the witness's]

---

[6] To the extent that these Supreme Court cases might be distinguished on the ground that the defendants *actually* cross-examined the witness, whereas Barbarin's counsel *declined* to cross-examine Garrott (as co-defendant Magee's counsel had already cross-examined Garrott, Ex. K at 129; *see also* Ex. K at 122–129), the Confrontation Clause requires only that the defendant have an *opportunity* to cross-examine. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) ("Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."); *United States v. Geiger*, 263 F.3d 1034, 1039 (9th Cir. 2001) ("Any failure to cross-examine [the witness] resulted not from lack of opportunity but from the defense attorney's utilization of that opportunity."). The California courts' conclusion on this point was therefore neither contrary to, nor an unreasonable application of, Supreme Court precedent.

1  presence at trial." *Barber v. Page*, 390 U.S. 719, 725 (1968).  Ultimately, "[t]he

2  lengths to which the prosecution must go to produce a witness is a question of

3  reasonableness."  *Roberts*, 448 U.S. at 74 (internal quotation marks omitted).

4      The California Court of Appeal analyzed this issue under an analogous

5  state-law "due diligence" standard.  *See Jackson v. Brown*, 513 F.3d 1057, 1084

6  (9th Cir. 2008) (noting similarity between California standard and federal

7  standard).  The Court of Appeal extensively reviewed the record and concluded

8  that "the prosecution made reasonable, diligent, good faith efforts to locate Garrott

9  and secure her attendance at trial."  Ex. G at 24.  Investigators first attempted to

10  locate Garrott more than a month before trial, and, after trial was continued for a

11  few months, they "visit[ed] . . . the Garrott residence almost every day" for over a

12  week "in a continuing attempt to find and subpoena" her.  Ex. G at 24–25; *see also*

13  RT at 770, 773–77.  The investigators also attempted to identify and locate

14  Garrott's friends, and searched for Garrott's name in police and Department of

15  Motor Vehicle records.  Ex. G at 23; *see also* RT at 781, 789, 791.  In light of

16  these facts, the Court of Appeal concluded that Garrott was "unavailable" despite

17  the prosecution's "good faith" and "reasonable" efforts to locate her.  Ex. G at 24.

18      The Court of Appeal's conclusion is neither contrary to, nor an

19  unreasonable application of, the Supreme Court's legal standard regarding witness

20  unavailability.  Of the Supreme Court's three leading cases involving witness

21  availability, the Government's efforts to locate Garrott are most like the efforts in

22  *Roberts*, where the Court approved of the prosecution's actions.  *Compare*

23  *Roberts*, 448 U.S. at 75–77 (holding that search was reasonable where the

24  prosecutor contacted witness's parents on multiple occasions and issued

25  subpoenas for the witness at the parents' home), *with Barber*, 390 U.S. at 723

26  (holding that effort was unreasonable where the prosecutor "made absolutely no

27

28                                        18

1    effort to obtain" the witness after learning that the witness was in federal prison in

2    another state); *see also Mancusi v. Stubbs*, 408 U.S. 204, 212 (1972) (holding that

3    effort was reasonable where witness had relocated to another country and the state

4    "was powerless to compel his attendance" at the trial); *Windham v. Merkle*, 163

5    F.3d 1092, 1102 (9th Cir. 1998) (holding that effort to locate witness was

6    reasonable where, *inter alia*, the prosecution's investigator checked police records

7    and attempted to locate witness at his home and his parent's home). This is true

8    even though, as Barbarin argued to the trial court, the investigators could have

9    theoretically taken any number of additional steps to secure Garrott's attendance.

10   *See generally* RT at 778–94 (cross-examination). "One, in hindsight, may always

11   think of other things." *Roberts*, 448 U.S. at 75.

12       The Court of Appeal's conclusion regarding Garrott's unavailability is

13   therefore not contrary to the Supreme Court's holdings. Moreover, the Supreme

14   Court has articulated a broad standard of "good faith" and "reasonableness," and,

15   under AEDPA, "[t]he more general the rule, the more leeway courts have in

16   reaching outcomes in case-by-case determinations." *Knowles v. Mirzayance*, 129

17   S. Ct. 1411, 1420 (2009) (internal quotation marks omitted); *see also Christian v.

18   Rhode*, 41 F.3d 461, 467 (9th Cir. 1994) ("'Good faith' and 'reasonableness' are

19   terms that demand fact-intensive, case-by-case analysis, not rigid rules."). The

20   Court of Appeal's conclusion regarding the prosecution's efforts to locate Garrott

21   is supported by the record, and is not "so lacking in justification that there was an

22   error well understood and comprehended in existing law beyond any possibility

23   for fairminded disagreement." *Harrington*, 131 S. Ct. at 786–87. Habeas relief is

24   not warranted on this ground.[7]

25

26       [7] To the extent that Barbarin's pleadings could be construed as raising a
     Confrontation Clause challenge to the in-court testimony of prosecution witnesses

27

1

C

2    Third, Barbarin contends that his right to effective assistance of counsel was

3  violated because his attorney failed to object properly to police officer Mathews'

4  testimony about his interview with Garrott.  Second Amended Petition at 6–7.

5  Barbarin raised this claim on direct appeal, in his initial state habeas petition, and

6  in his state habeas petition to the California Supreme Court.  Ex. J, Br. at 10.  The

7  California Supreme Court denied this claim on the merits, *see* Ex. J at 1, and the

8  California Court of Appeal's decision on direct appeal is the last reasoned state

9  court decision to address this claim.  Ex. G at 27–31.

10    Officer Mathews interviewed Garrott during his investigation of the murder,

11 and he was called to testify at trial about his interview in order to impeach

12 Garrott's inconsistent testimony during the preliminary hearing.  *See* Cal. Evid.

13 Code § 1202 ("Evidence of a statement or other conduct by a declarant that is

14 inconsistent with a statement by such declarant received in evidence as hearsay

15 evidence is not inadmissible for the purpose of attacking the credibility of the

16 declarant . . . ."); *see also id.* § 785 ("The credibility of a witness may be attacked

17 or supported by any party, including the party calling him.").  Barbarin's counsel

18 objected on the grounds of hearsay and lack of foundation, RT 839, but, in the

19 words of the Court of Appeal, failed to "ma[k]e any proper objection to the

20

_____

21 Mathews and Austin, *see* Traverse at 11–13, the Confrontation Clause does not
22 bar live, in-court testimony that is subject to cross-examination (such as
    Mathews's and Austin's testimony), and does not bar hearsay that is admitted for
23 impeachment purposes rather than the truth of the matter asserted (as with
    Mathews's testimony about Garrott's prior inconsistent statements).  *See*
24 *Crawford*, 541 U.S. at 59 n.9 ("The Clause does not bar admission of a statement
25 so long as the declarant is present at trial to defend or explain it.  []The Clause also
26 does not bar the use of testimonial statements for purposes other than establishing
    the truth of the matter asserted.").
27

28                                              20

1   admission of these hearsay statements for their truth." Ex. G at 27.  Barbarin now

2   contends that his counsel was ineffective because counsel failed to object to the

3   introduction of Garrott's police interview for its truth, and because counsel failed

4   "to request a limiting instruction that would have told the jury that [] Garrott's

5   prior inconsistent statements to Detective Mathews were admissible only for

6   purposes of impeachment and not for the truth."  Second Amended Petition at 6–7.

7        In *Strickland v. Washington*, the Supreme Court recognized that the Sixth

8   Amendment right to counsel includes "'the right to the effective assistance of

9   counsel.'"  466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S.

10  759, 771, n.14 (1970)).  The Court further recognized that an ineffective assistance

11  of counsel claim contains two elements: "First, the defendant must show that

12  counsel's performance was deficient," and "[s]econd, the defendant must show

13  that the deficient performance prejudiced the defense." *Id.* at 687.  "To establish

14  deficient performance, a person challenging a conviction must show that

15  'counsel's representation fell below an objective standard of reasonableness.'"

16  *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 688).  "With respect

17  to prejudice, a challenger must demonstrate 'a reasonable probability that, but for

18  counsel's unprofessional errors, the result of the proceeding would have been

19  different.  A reasonable probability is a probability sufficient to undermine

20  confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

21       "A trial counsel's failure to object to evidence which is inadmissible under

22  state law can constitute deficient performance under *Strickland*." *Delgadillo v.*

23  *Woodford*, 527 F.3d 919, 928 (9th Cir. 2008).  Likewise, a "trial counsel's failure

24  to request a limiting instruction" may "f[a]ll below an objective standard of

25  reasonableness" under *Strickland*.  *Musladin v. Lamarque*, 555 F.3d 830, 846–47

26  (9th Cir. 2009) (internal quotation marks omitted).  Here, Respondent Scribner

27

28                                                21

does not contend that counsel's performance was adequate.  Answer at 34–35 &
n.20.  Although the California Court of Appeal concluded that counsel's
performance *was* adequate, Ex. G at 29, Barbarin subsequently obtained affidavits
from both his counsel and his co-defendant's counsel stating that they "had no
tactical reason for failing to object" to the admission of Garrott's interview
statements, or for failing to request a limiting instruction to inform the jury that the
statements were admissible for impeachment purposes only.  Traverse Ex. A.
These affidavits appear to have been submitted to the California Supreme Court in
Barbarin's most recent petition for writ of habeas corpus, *see* Ex J, Br. at 11,
which the California Supreme Court denied on the merits, Ex. J at 1, so this court
will assume for purposes of its decision that it may consider these affidavits.  *See*
*Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) ("We now hold that review
under § 2254(d)(1) is limited to the record that was before the state court that
adjudicated the claim on the merits.").  It is therefore appropriate to assume, as
Scribner does, that counsel's performance was deficient.

Nevertheless, regardless of whether or not counsel's performance was
deficient, the California courts reasonably concluded that Barbarin failed to
establish that counsel's deficient performance caused prejudice.  *See* Ex. G at
29–31.  It is true, as Barbarin contends, that Garrott's out-of-court statements to
Mathews provided the strongest evidence of the principal Magee's motive for the
murder (namely, Magee's suspicion that the victim Terrell had stolen Magee's
amplifier).  RT 840; *see also, e.g.*, RT 1456–57 (prosecutor's closing argument).
But Garrott was not the only witness to testify that, on the night of the murder,
Magee said he "caught up with" somebody; witness Austin also testified that she
heard Magee say, "I finally caught up with him."  RT 856.  From that statement
(which Barbarin does not claim was inadmissible), the jury could reasonably infer

that Magee had been looking for Terrell.  There was accordingly other evidence in the record supporting the prosecution's theory regarding motive.

But in any event, "motive is not an element of the crime."  *People v. Solomon*, 234 P.3d 501, 520 (Cal. 2010); *see generally People v. Durham*, 449 P.2d 198, 204 (Cal. 1969) (describing aiding and abetting under California law).  Even without evidence of Magee's motive (or Barbarin's knowledge of that motive), ample evidence supported Barbarin's conviction.  In addition to Barbarin and Magee's own testimony (which the jury evidently rejected), two different eyewitnesses testified about the murder.  Ex. G at 29–30.  As the Court of Appeal wrote, this eyewitness testimony "clearly showed Magee shot Terrell in cold blood and without provocation."  Ex. G at 30.  As for Barbarin's participation in that murder, it was witness Martin—*not* the unavailable witness Garrott—who testified that Barbarin told Magee, "'Man, dump on that nigger,'" immediately before Magee shot Terrell.  RT 654.  Thus, regardless of Garrott's testimony, the jury heard evidence suggesting that Barbarin encouraged the murder.  Moreover, as the Court of Appeal recognized, circumstantial evidence also supported the conviction.  "Barbarin's own claim that he had walked away and was not looking when the first shot was fired is contradicted by the testimony of both Williams and Martin that he was standing at Magee's side at the moment the first shots were fired."  Ex. G at 30.  Barbarin then fled the scene along with Magee, and "[o]n his arrest, Barbarin gave a false name to the police and attempted to fabricate various alibis, further reflecting his consciousness of guilt."  Ex. G at 30.  Thus, "[e]ven without Garrott's testimony and Detective Mathews's testimony impeaching it, the evidence of [Barbarin's] guilt in this case is sufficiently substantial to support [his] conviction[]."  Ex. G at 29.  The Court of Appeal accordingly concluded:

> On this record, it is not reasonably probable that a result more favorable to [Barbarin] would have been reached had Garrott's

23

1

2

3

> preliminary hearing testimony been excluded along with the hearsay evidence of her statements to Detective Mathews. Thus, even if [Barbarin] received ineffective assistance of counsel, there are no grounds for reversal on this basis because of the lack of any prejudice.

4 Ex. G at 30–31.

5       The California courts' conclusions are neither contrary to, nor unreasonable

6 applications of, the Supreme Court's precedents regarding prejudice resulting from

7 ineffective assistance of counsel. 28 U.S.C. § 2254(d)(1); *see, e.g.*, *Pinholster*,

8 131 S. Ct. at 1408–11 (applying AEDPA and upholding state court's conclusion

9 that no prejudice resulted from ineffective assistance of counsel); *Harrington*, 131

10 S. Ct. at 791–92 (same). Habeas relief is not warranted on this ground.

11 D

12       Fourth, Barbarin contends that his due process rights were violated because

13 the trial court declined to instruct the jury that he could be found guilty as an

14 accessory after the fact, rather than guilty of aiding and abetting. The California

15 Court of Appeal's decision on direct appeal is the last reasoned state court

16 decision to address this claim. Ex. G at 35–38.

17       The Ninth Circuit has held that, for AEDPA purposes, it is clearly

18 established that "the state court's failure to correctly instruct the jury on the

19 defense may deprive the defendant of his due process right to present a

20 defense. . . . This is so because the right to present a defense would be empty if it

21 did not entail the further right to an instruction that allowed the jury to consider

22 the defense." *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) (internal

23 quotation marks omitted); *see also Conde v. Henry*, 198 F.3d 734, 739–40 (9th

24 Cir. 1999) (stating similar rule under pre-AEDPA habeas standard).

25       However, as the California Court of Appeal explained in its decision on

26 direct appeal, Barbarin's proposed instruction regarding "the offense of accessory

27

28 24

after the fact is not a *defense* to murder, but an entirely separate crime, which is not even partially included within the charged offense of murder." Ex. G at 38. Under state law, "the crime of accessory after the fact is not a lesser *included* offense [of murder], but a lesser *related* one," and "a defendant has no 'unilateral entitlement to instructions on lesser offenses which are not necessarily included in the charge.'" Ex. G at 35–36 (citing *People v. Kraft*, 5 P.3d 68 (Cal. 1998); quoting *People v. Birks*, 960 P.2d 1073, 1090 (Cal. 1998)); *see also* Cal. Penal Code § 32 (establishing accessory after the fact as separate offense).

As the Court of Appeal recognized, Ninth Circuit precedent requires, as a matter of constitutional due process, that state trial courts must instruct the jury on defenses that "could have completely absolved the defendant of the charge." *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009). For example, courts generally must give an instruction on a defendant's proposed entrapment defense, because that defense, if accepted by the jury, would exonerate the defendant of the charges. *Bradley*, 315 F.3d at 1099. However, cases addressing *defenses* are inapposite with respect to Barbarin's request for instructions on a separate *offense*. There is no clearly established Supreme Court law requiring trial courts to give jury instructions regarding lesser-included offenses in non-capital cases, let alone related lesser offenses that are not included in the charged offense. As the Court of Appeal explained, Barbarin's accessory-after-the-fact theory "is not a defense to murder, because it does not excuse, exonerate or justify the murder," and that, "[b]ecause it did not constitute a defense to the crime of murder, Barbarin's theory based on the separate, lesser related offense of accessory after the fact did not fall within the scope of the trial court's responsibility to instruct on a defense theory." Ex. G at 38.

The Court of Appeal's conclusion is a reasonable application of clearly established federal law.  Even if Barbarin had requested an instruction on a lesser-*included* offense, the Ninth Circuit has held that "'the failure of a state court to instruct on a lesser offense in a non-capital case fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding.'"  *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (alterations omitted) (quoting *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  The Supreme Court has made a similar statement, *see Howell v. Mississippi*, 543 U.S. 440, 445 (2005) (per curiam) (suggesting that due process requirement for instructions on lesser-included offenses applies only in capital cases), and the Ninth Circuit has recently reaffirmed its prior rule, *United States v. Rivera-Alonzo*, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases."); *see also United States v. Carothers*, 630 F.3d 959, 967 (9th Cir. 2011) ("[I]t [is] not clear that Carothers is constitutionally entitled to a lesser included instruction in this noncapital case.").

Similarly, there is neither Ninth Circuit nor Supreme Court authority standing for the proposition that a non-capital defendant is constitutionally entitled to an instruction on an uncharged offense that is *not* included within the charged offense.  In the capital context, the Supreme Court has rejected such a requirement.  *Hopkins v. Reeves*, 524 U.S. 88, 97 (1998) ("The Court of Appeals in this case . . . required in effect that States create lesser included offenses to all capital crimes, by requiring that an instruction be given on some other offense—what could be called a 'lesser related offense'—when no lesser included offense exists.  Such a requirement is not only unprecedented, but also

1  unworkable.").  In the non-capital context, the most analogous authority in this

2  circuit has also rejected such a claim.  A judge on the Northern District of

3  California held that the state trial court's failure to give an accessory-after-the-fact

4  instruction in lieu of (or in addition to) an aiding-and-abetting instruction was not

5  an unreasonable application of clearly established Supreme Court law.  *Gonzales*

6  *v. Terhune*, No. C 03-1565 TEH, 2006 WL 83054 at \*12–13 (N.D. Cal. Jan. 12,

7  2006), *aff'd on other grounds and certificate of appealability denied*, 315 F.

8  App'x 648 (9th Cir. 2009) (unpublished memorandum disposition).

9       Because there is no clearly established Supreme Court precedent requiring

10  state trial courts to instruct non-capital juries on lesser offenses (whether they are

11  lesser-included offenses or lesser related offenses), the Court of Appeal's rejection

12  of this claim was neither contrary to, nor an unreasonable application, of federal

13  law.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings

14  from this Court regarding the [issue] . . . involved here, it cannot be said that the

15  state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (quoting 28

16  U.S.C. § 2254(d)(1)).  Habeas relief is not warranted on this ground.

17                        E

18       Fifth, Barbarin contends that his equal protection rights were violated under

19  *Batson v. Kentucky*, 476 U.S. 79 (1986), because the prosecutor exercised

20  peremptory challenges against three African-American prospective jurors.  The

21  California Court of Appeal's decision on direct appeal is the last reasoned state

22  court decision to address this claim.  Ex. G at 12–20.[8]

23

24      [8] Scribner states in his Answer that de novo review, rather than AEDPA

25  deference, is required to determine whether Barbarin made a prima facie showing
under *Batson*.  Answer at 46.  However, this court is "not bound by a party's

26  concession as to the meaning of the law, even if that party is the government and

27  even in the context of a criminal case."  *United States v. Ogles*, 440 F.3d 1095,

28                       27

In *Batson*, the Court held:

> [T]he Equal Protection Clause forbids the prosecutor
> to challenge potential jurors solely on account of their race
> or on the assumption that black jurors as a group will be
> unable impartially to consider the State's case against a
> black defendant. . . .
>
>        To establish such a case, the defendant first must
> show that he is a member of a cognizable racial group, and
> that the prosecutor has exercised peremptory challenges to

_____

1099 (9th Cir. 2006) (en banc).

It is true that the Ninth Circuit has required de novo review in cases where California courts require a showing of a "strong likelihood" of group bias (as articulated in the state-law case *People v. Wheeler*, 583 P.2d 748 (Cal. 1978)) rather than a "reasonable inference" of group bias (as articulated in *Batson*). *See, e.g.*, *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002); *Cooperwood v. Cambra*, 245 F.3d 1042, 1047 (9th Cir. 2001); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir.2000); *see also Johnson v. California*, 545 U.S. 162, 173 (2005) (holding that "California's 'more likely than not' standard is at odds with the prima facie inquiry mandated by *Batson*"). Here, however, the California Court of Appeal explicitly discussed the difference between *Wheeler* and *Batson*, and even acknowledged the Ninth Circuit's holding in *Wade* that the more stringent *Wheeler* standard is not a correct application of *Batson*. Ex. G at 14–15. Importantly, the Court of Appeal then stated, "For purposes of this appeal, we therefore apply the 'reasonable inference' test in our review of the merits of the trial court's finding . . . that [Barbarin] failed to demonstrate a prima facie case of race-based discrimination with respect to the prosecution's peremptory challenge of the Prospective Juror." Ex. G at 15.  The court then analyzed Barbarin's contentions under both *Wheeler* and *Batson*, and cited Ninth Circuit case law decided under *Batson*.  Ex. G at 17, 18 n.7 (citing *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994); *United States v. Chinchilla*, 874 F.2d 695, 698 (9th Cir. 1989)).

As the Ninth Circuit held in a nearly identical setting, "Because the court of appeal recognized the difference between the two standards [*Batson* and *Wheeler*], and affirmed the trial court under both, its determination deserves deference." *Boyd v. Newland*, 467 F.3d 1139, 1144 (9th Cir. 2006).  That conclusion applies to this case as well, and, despite Scribner's concession to the contrary, AEDPA deference is therefore appropriate.

28

remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination. [¶] In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. . . . The trial court then will have the duty to determine if the defendant has established purposeful discrimination.

476 U.S. at 89, 96–98 (citations and internal quotation marks omitted); *see also Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (summarizing *Batson* in AEDPA context).

The Superior Court rejected Barbarin's *Batson* claim after finding that a prima facie showing (the first step of *Batson*) had not been made. RT at 285. The Court of Appeal affirmed this conclusion. Ex. G at 16–20. Barbarin now contends that the state courts erred in this analysis. He argues that he established a prime facie showing because the prosecutor struck "three prospective jurors of African-American descent" while "only one African-American remained on the panel." Second Amended Petition at 8.

To make a prima facie showing under *Batson*, the defendant "must show that (1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race." *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006) (quoting *Batson*, 476 U.S. at 96). It is undisputed that Barbarin has satisfied the first two elements: the three

29

prospective jurors were African-American, and the prosecution used peremptory challenges to remove them from the jury. Thus, "[o]nly the third element of the prima facie case is at issue, that is, whether the state court erred in failing to recognize an inference of racial motivation." *Id.*

In order to determine if there is a reasonable inference of racial motivation, "a court must consider the 'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." *Id.* at 1146 (quoting *Batson*, 476 U.S. at 94). The Court has also explained that deference to state trial judges is particularly appropriate when assessing the facts and circumstances of the challenged action:

> During jury selection, the entire *res gestae* take place in front of the trial judge. Because the judge has before him the entire venire, he is well situated to detect whether a challenge to the seating of one juror is part of a "pattern" of singling out members of a single race for peremptory challenges. He is in a position to discern whether a challenge to a black juror has evidentiary significance; the significance may differ if the venire consists mostly of blacks or of whites.

*United States v. Armstrong*, 517 U.S. 456, 467–68 (1996) (quoting *Batson*, 476 U.S. at 97); *see also Tolbert v. Page*, 182 F.3d 677, 682 (9th Cir. 1999) (en banc) (relying on a similar line of reasoning and concluding that, "[a]t the *Batson* prima facie showing step . . . a deferential standard of review prevails").

Aside from these general observations, the Supreme Court had not provided any significant additional guidance regarding the first step of *Batson* at the time the California Court of Appeal issued its decision in Barbarin's case. Even the *Batson* Court itself refrained from deciding whether the defendant made a prima facie showing where "[t]he prosecutor used his peremptory challenges to strike all four black persons on the venire, and a jury composed only of white persons was selected." 476 U.S. at 82. Instead, the Court remanded the case so that the lower

courts could decide the issue in the first instance  as part of the full three-step

analysis. *Id.* at 100.  Thus, at the time that the Court of Appeal issued its decision

in this case, there were no clear Supreme Court holdings applying *Batson*'s "prima

facie" standard.[9]

     In the absence of clear Supreme Court case law, Ninth Circuit authority is

relevant to this court's analysis.  *See Yee v. Duncan*, 463 F.3d 893 (9th Cir. 2006)

("In determining whether a state court's decision involved an unreasonable

application of clearly established federal law, it is appropriate to refer to decisions

of the inferior federal courts in factually similar cases." (internal quotation marks

omitted)).  This body of case law compels the conclusion that the Court of Appeal

reasonably applied *Batson* when it concluded that a prima facie showing had not

---

     [9] After Barbarin filed this petition, the Supreme Court decided *Johnson v. California*, a case on direct review from the California Supreme Court.  The Court held that the defendant made a prima facie showing where the prosecution used some of its peremptory challenges "to remove the black prospective jurors" so that "[t]he resulting jury, including alternates, was all white." 545 U.S. at 164.  The Court agreed with the California Supreme Court's statement that "'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury,'" and accordingly held that the defendant had made a prima facie showing under *Batson*.  *Id.* at 173 (quoting *People v. Johnson*, 71 P.3d 270, 286 (Cal. 2003)).

     *Johnson* cannot be considered as part of the AEDPA analysis because it was issued after the California Court of Appeal decided Barbarin's case.  *Musladin*, 549 U.S. at 74 ("clearly established Federal law in § 2254(d)(1) refers to the holdings . . . of this Court's decisions as of the time of the relevant state-court decision" (internal quotation marks omitted)); *cf. Williams v. Runnels*, 432 F.3d 1102, 1105 & n.5 (9th Cir. 2006) (relying on *Johnson* when applying de novo review rather than AEDPA deference).  However, even if *Johnson* were considered, it would not affect the conclusion that the Court of Appeal's decision was not unreasonable, as the facts of *Johnson* (the prosecution removed all of the prospective African-American jurors, and the jury was entirely white) are readily distinguishable from the facts of Barbarin's case.

been made.  The Ninth Circuit has said that "the willingness of a prosecutor to accept minority jurors weighs against the findings of a prima facie case." *United States v. Chinchilla*, 874 F.2d 695, 698 n.4 (9th Cir. 1989).  The court cited approvingly an out-of-circuit case in which three African-Americans were removed from the jury but two remained, and another case in which two African-Americans were removed by the prosecution, one was removed by the defendant, and one remained on the jury.  *Id.* (citing *United States v. Dennis*, 804 F.2d 1208, 1210–11 (11th Cir. 1986); *United States v. Montgomery*, 819 F.2d 847, 851 (8th Cir. 1987)).  Subsequently, the Ninth Circuit affirmed a district court's finding that a prima facie showing had not been made where the prosecution challenged two African-Americans and three African-Americans were empaneled on the jury. *United States v. Wills*, 88 F.3d 704, 715 (9th Cir. 1996); *see also United States v. Stinson*, __ F.3d __, slip op. at 10282 (9th Cir. Aug. 5, 2011) (affirming district court's conclusion that prima facie showing of gender discrimination was absent where prosecution challenged two men in addition to the five women, and court identified non-discriminatory reason for excusing challenged female juror).

The facts of these cases are analogous to the facts of Barbarin's case: of the five African-Americans available in the jury pool who were not excused for cause or hardship, the prosecution exercised peremptory challenges to remove only three of them, Barbarin removed another, and one ultimately served on the jury.  Ex. G at 17; RT 283, 285.  Consistent with the Ninth Circuit's holding in *Wills*, and its citations in *Chinchilla*, the Court of Appeal reasonably rejected Barbarin's "slim statistical argument."  Ex. G at 17.[10]

------------------------------------------------

[10] The Ninth Circuit has also reached a contrary conclusion in similar situations.  *E.g.*, *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) (finding prima facie case where the prosecutor "struck five out of six possible black jurors

Not only did the Court of Appeal reasonably conclude that the statistical data was not sufficient to support a prima facie case, but the Court of Appeal also reasonably examined the "facts" and "circumstances" surrounding the prosecutor's actions. *Batson*, 476 U.S. at 94.[11]  The Ninth Circuit has said that, when "'the record contains entirely plausible reasons, independent of race, why' a prosecutor may have exercised peremptories, such reasons have usually helped persuade us that defendant made no prima facie showing . . . ." *Paulino v. Castro*, 371 F.3d 1083, 1091–92 (9th Cir. 2004) (quoting *Wade*, 202 F.3d at 1198).  Here, the Court of Appeal independently examined the record and concluded that "there were ample nondiscriminatory grounds upon which the prosecution might reasonably

_____

and accepted only one"); *Fernandez*, 286 F.3d at 1078 (finding prima facie case where prosecutor struck four out of seven Hispanic jurors) (collecting cases). Crucially, however, those conclusions were reached through de novo review, not AEDPA deference.  Circuit law decided on de novo review "does not represent clearly established federal law 'as determined by the Supreme Court of the United States,'" and does not control this court's AEDPA analysis.  *Kessee v. Mendoza-Powers*, 574 F.3d 675, 679 (9th Cir. 2009) (quoting 28 U.S.C. § 2254(d)(1)).

[11] Although the trial judge asked for prosecutor's response to Barbarin's *Batson* motion, RT 284,  and the Court of Appeal briefly discussed the prosecutor's general statements regarding his use of peremptory challenges, Ex. G at 18–19 n.8, neither court relied on the prosecutor's statements as support for rejecting the prima facie *Batson* showing.  The courts properly refrained from relying on the prosecutor's statements at the first step of the *Batson* analysis, *see Fernandez*, 286 F.3d at 1079 ("Case law suggests that we should not even consider the prosecutor's unsubstantiated explanations at the stage of determining whether a *prima facie* case exists."), and reasonably decided to reach their conclusions at the first step of the *Batson* analysis, rather than proceeding to the second and third steps, *see United States v. Guerrero*, 595 F.3d 1059, 1063 (9th Cir. 2010) (analyzing *Batson* challenge under step one where trial judge concluded that defendant failed to make prima facie showing, despite judge's brief inquiry into prosecutor's reasons for challenging the juror).

33

1   have exercised peremptory challenges to the prospective jurors at issue." Ex. G at

2   18.  Barbarin conceded to the Court of Appeal that the prosecutor had race-neutral

3   reasons with respect to one of the three African-American jurors who had been

4   excluded by the prosecution.  Ex. G at 19; *see also* Ex. F at 12.  The Court of

5   Appeal reasonably relied on this concession.  *See Wade*, 202 F.2d at 1198

6   ("[P]etitioners did not argue to the district court, and do not argue to us, that race

7   was a factor in the challenge to [one juror].").  Of the two jurors' whose removals

8   were challenged on appeal, one of them had expressed concerns about the

9   "'emotional difficulty'" of serving on the jury, and said that she "'would prefer not

10  to serve.'"  Ex. G at 19.  When asked if she could be fair, she said that she

11  "'owe[d] it to the defendant to give it [her] best,'" and had to be "pressed" before

12  she "add[ed] that she also owed it to the court, the prosecution and the victim."

13  Ex. G at 19.  As for the other juror in dispute, when she was asked about her son's

14  employment as a deputy sheriff, she "volunteered that she did not discuss his work

15  with him and was not involved with it in any way."  Ex. G at 19.  The Court of

16  Appeal concluded that "[t]he prosecutor could reasonably have felt that this juror's

17  eagerness to dispel any defense apprehension that she might favor the prosecution

18  evidenced a possible bias in favor of the defense."  Ex. G at 19.

19      The Court of Appeal's analysis and conclusions were not "so lacking in

20  justification that there was an error well understood and comprehended in existing

21  law beyond any possibility for fairminded disagreement."  *Harrington*, 131 S. Ct.

22  at 786–87.  Its mode of analysis was consistent with Supreme Court and Ninth

23  Circuit precedents regarding the prima facie *Batson* showing; its discussion of the

24  facts was supported by the record; and it reasonably applied the proper legal

25  principles to those facts.  The court's holding was therefore not contrary to any

26  holdings of the United States Supreme Court, 28 U.S.C. § 2254(d)(1), was not an

27

28                                              34

1  unreasonable application of the holdings of the United States Supreme Court, *id.*,

2  and was not "based on an unreasonable determination of the facts in light of the

3  evidence presented," *id.* § 2254(d)(2).  Habeas relief is not warranted on this

4  ground.

5                                             F

6           Finally, Barbarin contends that his due process rights were violated when

7  the trial court instructed the jurors to inform the court if any other juror refused to

8  deliberate or expressed an intention to disregard the law.  *See* California Jury

9  Instructions-Criminal (CALJIC) 17.41.1.  The Court of Appeal rejected this claim

10  on direct appeal.  Ex. G at 31–34.

11          The Ninth Circuit has held that there is "no Supreme Court precedent

12  clearly establishing that CALJIC 17.41.1 . . . violated [a defendant's]

13  constitutional rights."  *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004).  The

14  court held that, because "there is no clearly established federal law determined by

15  the Supreme Court that indicates that the use of CALJIC 17.41.1 was

16  constitutionally improper," the California Court of Appeal did not unreasonably

17  apply clearly established federal law in rejecting" this claim.  *Id.* at 954.

18          *Brewer v. Hall* constitutes binding circuit precedent that forecloses

19  Barbarin's claim regarding CALJIC 17.41.1.  Habeas relief is not warranted on

20  this ground.

21                                            G

22          In his initial petition, Barbarin raised an additional claim of insufficient

23  evidence.  Petition at 18–19.  However, he subsequently filed a pair of amended

24  petitions.  Doc. 7; Doc. 18.  The Second Amended Petition is now the operative

25  petition.  *See Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967) ("The amended

26  complaint supersedes the original, the latter being treated thereafter as

27

28                                            35

1  non-existent.").  "It has long been the rule in this circuit that a plaintiff waives all

2  causes of action alleged in the original complaint which are not alleged in the

3  amended complaint." *London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir.

4  1981).  This conclusion, which is derived from Federal Rule of Civil Procedure

5  15, applies with full force in habeas proceedings.  *See Mayle v. Felix*, 545 U.S.

6  644, 654 (2005); 28 U.S.C. § 2242; *cf. Sechrest v. Ignacio*, 549 F.3d 789, 804 (9th

7  Cir. 2008) (acknowledging this general rule in habeas proceedings, but declining

8  to apply it because of the particular facts presented to the court).  Accordingly,

9  these claims have been waived because they are not included in the Second

10 Amended Petition.  This conclusion holds true despite the fact that Barbarin

11 discusses his sufficiency-of-the-evidence claim in his Traverse.  *See* Traverse at

12 15–17.  "A Traverse is not the proper pleading to raise additional grounds for

13 relief." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

Conclusion

15         It is hereby ordered that Barbarin's application for a writ of habeas corpus is

16 DENIED.  The Clerk is directed to enter judgment and close the case.

18 DATED: August 18, 2011

19                              /s/ Milan D. Smith, Jr.

20                              UNITED STATES CIRCUIT JUDGE

21                              Sitting by Designation

36